UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL L. DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-CV-2258-JCH |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| Acting Commissioner of Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Carol Dunn's ("Dunn") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (Tr. 117-125). Dunn alleged disability due to seronegative spondyloarthropathy[2], osteonecrosis[3] of the knees, and asthma. (Tr. 147.) For the reasons set forth below, the Administrative Law Judge's ("ALJ") decision will be affirmed.

**I.     Procedural History**

Dunn filed an application for disability insurance benefits on August 27, 2009. (Tr. 117-25.) The Social Security Administration ("SSA") denied Dunn's claim and she filed a timely

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

[2] Seronegative Spondyloarthropathy is a "general term comprising a number of degenerative joint diseases having common clinical, immunologic, pathologic, and radiographic features involving synovitis of the peripheral joints, enthesopathy, bony ankylosis of the large peripheral joints, lack of rheumatoid factor, and in many cases, a positive status for the human leukocyte antigen HLA-B27." Dorland's Illustrated Medical Dictionary 1754 (37th ed. 2012). Ankylosing Spondylitis is included in this group of diseases. *Id.*

[3] Osteonecrosis is "necrosis of the bone due to obstruction of its bone supply." Dorland's Illustrated Medical Dictionary 1347 (37th ed. 2012).

request for a hearing before an administrative law judge ("ALJ"). (Tr. 71-78, 80.) The SSA granted Dunn's request and a hearing took place on May 17, 2011. (Tr. 25-70, 85-90.) At the administrative hearing, Dunn and vocational expert ("VE") Dr. Robin A. Cook testified. (Tr. 27.) Dunn was represented by counsel.

On July 18, 2011, the ALJ issued a written decision upholding the denial of benefits. (Tr. 12-24.) Dunn requested review of the ALJ's decision by the Appeals Council. (Tr. 6–8.) The Appeals Council denied Dunn's request for review on October 16, 2012. (Tr. 1–3.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107 (2000). Dunn filed this appeal to the United States District Court Eastern District of Missouri on December 6, 2012. [Doc. 1.] Dunn filed a Brief in Support of her Complaint on March 11, 2013. [Doc. 6.] The Commissioner filed an Answer and Brief in Support of the Answer on May 31, 2013. [Doc. 11.]

## II. Standard of Review

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. § 404.1520(a). First, the claimant must not be engaged in substantial gainful activity. *Id.* Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 404.1520(d). Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. § 404.1520(f). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy.

*Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(v).

This Court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Therefore, even if this Court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler,* 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater,* 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

**III.    Decision of the ALJ**

The ALJ determined that Dunn last met the insured status requirements of the Social Security Act on December 31, 2007. (Tr. 14.) The ALJ found that Dunn did not engage in substantial gainful activity during the period from her alleged onset date of July 1, 2004 through the date last insured of December 31, 2007. (Tr. 14.) He also determined that Dunn had the severe impairments of lower back pain resulting from a thoracic sprain and strain, chronic rhinitis/asthma, osteoporosis in her knees, and anemia. (Tr. 14.) The ALJ found that through the date last insured, Dunn did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Appendix 1. (Tr. 15.) Next, the ALJ found that Dunn had the residual functional capacity to lift a maximum of twenty pounds and frequently lift ten pounds; stand or walk six hours and sit six hours in an eight-hour workday. (Tr. 15.) He also found that Dunn needed a sit-stand option at the work site with the option to change positions frequently. (Tr. 15.) He determined that Dunn could occasionally climb stars and ramps, stoop and crouch. (Tr. 15.) Dunn cannot climb ropes, ladders, scaffolds, and can never kneel or crawl. (Tr. 15.) Dunn also must avoid concentrated exposure to extreme cold, heat, wetness, humidity, fumes, odors, dust, vibrations, and gases. (Tr. 15.) Then, the ALJ determined that Dunn was capable of performing her past relevant work as a receptionist and cosmetics salesperson. (Tr. 19.) The ALJ concluded that Dunn was not under a disability as defined in the Social Security Act anytime time from July 1, 2004, the alleged onset date, through December 31, 2007, the date last insured. (Tr. 20.)

**IV.    Administrative Record**

The following is a summary of relevant evidence before the ALJ:

### A. Hearing Testimony

#### 1. Dunn's Testimony

Dunn testified that she was forty-one years of age at the time of the hearing. (Tr. 30.) She received a high school diploma, attended real estate school, and was licensed as a real estate agent. (Tr. 31.) Dunn stated she was married, had a twelve-year-old son, and lived in a two-story house with bedrooms on the second floor. (Tr. 30-31, 33.) During the fifteen years before her date last insured, Dunn worked as an Avon salesperson, receptionist, machine filler, vet technician, kennel supervisor, and real estate agent. (Tr. 33-36.)

Dunn testified that she had not worked steadily since 2002, although she had sold Avon from September 2004 through January 2007. (Tr. 33-34.) She took the Avon position because she was already having intermittent health problems, and she thought she would do well with a job where she could set her own hours and deliver catalogues "on her good days." (Tr. 37.) She testified that she had to stop going to the gym in 2001 because of her osteonecrosis (Tr. 47), but that it did not keep her from working. (Tr. 45.)

Dunn testified that she went through several doctors over the years who missed the spondyloarthropathy diagnosis; it was not until she saw Dr. Garriga in January 2008 that films and blood work led to the diagnosis. (Tr. 38-39.) She was in a car accident in 2004 and was still having problems with pain a year later; the insurance company felt there must have been a pre-existing condition. (Tr. 38-39.) Dunn stated that she provided Dr. Garriga with the films from that accident, and he told her the spondylitis showed up on those 2004 films. (Tr. 39.)

Dunn testified that as of her date last insured she could perform household chores such as housekeeping, cooking, dishwashing, laundry, vacuuming, gardening, and grocery shopping (Tr.

5

50-51), but that it would take her all day to clean one room because she had to stop so frequently. (Tr. 55-56.) Dunn stated that cutting the grass incapacitates her for the next three days. (Tr. 50-51.) She stated she struggled to walk very short distances (less than a minute), could not sit for more than thirty minutes, and could not lift more than five pounds. (Tr. 52.) Since 2004, she said she has had good days and bad days, and that on average she has four bad days per month, but it may be as few as two or three, for more than a week at a time. (Tr. 55.)

### 2. VE Testimony

Vocational Expert Dr. Robin A. Cook testified regarding Dunn's past relevant work experience. Dunn's experience as a machine packager was medium exertional level and unskilled, with an SVP of 2[4] and her multiple receptionist jobs were semi-skilled work, exertional level sedentary, SVP 4. (Tr. 60-61.) The kennel attendant job was semi-skilled work, exertional level medium, SVP 4; the vet technician job was skilled work, exertional level medium, SVP 6. (Tr. 61.) Her work in cosmetic sales is classified as semi-skilled work, light exertional level with an SVP of 4. (Tr. 62.) The VE testified that Dunn's sales skills would transfer to a variety of other sales work, and the receptionist skills would transfer to a variety of other office applications. (Tr. 63.)

The ALJ posed the following hypothetical question:

> I want to assume a hypothetical individual with the training and experience as the claimant. This individual can perform light work, but must have a sit/stand option at the worksite with the ability to change positions frequently. This individual can occasionally climb stairs and ramps; never climb ropes, ladders, scaffolds; can occasionally stoop, and crouch; never kneel, never crawl. This individual must avoid concentrated exposure to extreme cold, heat, wetness,

---

[4] SVP is the acronym for "specific vocational preparation time; i.e., how long it generally takes to learn a job." *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998).

humidity, vibrations, and fumes, odors, dust, gas. Would that individual be able to perform any past work?

(Tr. 63.) The VE testified that this hypothetical individual would be able to perform the receptionist job and cosmetic sales job, but with an approximately 75 percent reduction since most of these jobs would be in-store. (Tr. 64, 66.)

Changing the above hypothetical to purely sedentary work, with no sit/stand option, the VE testified the hypothetical individual would be able to perform receptionist work and other jobs, one of which would be final assembler optical. (Tr. 67.) If, however, the hypothetical individual required two additional breaks beyond the normal two breaks plus lunch, the VE opined there would be no consistent jobs available, with or without accommodation. (*Id.*) If the hypothetical individual would require absenteeism of more than one day per month or, alternatively, if pain would frequently interfere with the attention and concentration to perform even simple work tasks, those conditions would preclude all work. (Tr. 68-69.)

### B. Medical Evidence

The medical evidence is as follows:

#### 1. Woods Mill Orthopedics

Dr. Richard D. Rames, an orthopedic doctor, treated Dunn for problems with her knees. (Tr. 474.) On May 1, 2003, Dr. Rames prepared a letter for Dr. Robert Uchiyarna noting that Dunn's knees "were doing quite well despite the large oseochondritis lesions" and that "radiographs of her lumbar spine showed good alignment and no arthritic changes." (Tr. 474.) He also stated that "her bone density was good for both her hips and her spine and that she had full range of motion in all planes. (Tr. 474.) Dr. Rames mentioned that Dunn had complained of some bilateral hip pain and he diagnosed her with trochanteric bursitis. (Tr. 474.) He ordered her to take one Aleve per day. (Tr. 474.)

### 2. Dr. Amin Radparvar

Dr. Radparvar treated Dunn between January 2004 and May 2006. (Tr. 230-270.) Dr. Radparvar treated Dunn for back spasms, neck and hip pain, allergies, asthma, heart palpitations, irregular breathing, and sleeping problems. (Tr. 230-245.) A bone density test dated April 7, 2006 showed that the bone mineral density of Dunn's lumbar spine and hip were at the low end of the normal range. (Tr. 246.)

### 3. Dr. Timothy Lang

Dr. Timothy Lang treated Dunn for elbow and right hip pain between February and August 2004. (Tr. 274-277.) Dr. Lang found that an MRI of the hip region in July 2004 was negative, except for some ovarian swelling and some fluid in the pelvis. (Tr. 274.) X-rays of the hip from June 2004 showed no bony or soft tissue abnormalities. (Tr. 274.) On August 26, 2006, Dr. Lang diagnosed Dunn with bilateral knee osteonecrosis and opined that her treatment should largely be symptomatic, even though she may limit her impact activity. (Tr. 272.) At the time of the visit, Dunn expressed that she had no pain or swelling and Dr. Lange found she had full painless-passive range of motion. (Tr. 272.)

### 4. Dr. Amy Fridley

Dunn visited Dr. Amy Fridley, a chiropractor, for treatment from June 22, 2004 to May 11, 2005. (Tr. 221-228.) Dr. Fridley treated Dunn for thoracic sprain or strain and lumbosacral radicular syndrome due to a car accident. (Tr. 221.) Treatment included muscle stimulation, intersegmental traction, and spinal adjustment. (Tr. 222-228.)

### 5. Dr. Rand E. Danker

Dr. Danker treated Dunn for asthma, chronic rhinitis[5], and bronchitis between December 2005 and December 2010. (Tr. 395-411.) Images of her sinuses in 2005 showed mild ethmodial and bimaxillary mucoperiosteal thickening. (Tr. 410.) In 2010, coronal images of the sinuses show no abnormal mucous thickening. (Tr. 411.) Allergy testing showed no allergies. (Tr. 395, 397.)

### 6. Dr. Patricia Blair

Dr. Patricia Blair treated Dunn from November 2006 to April 2011. (Tr. 329-360, 456-458.) Dr. Blair treated Dunn for a variety of ailments, including sinus infection, osteoporosis, asthma, anemia, allergies, vertigo, nausea, fatigue, dyspnea[6], attention deficit hyperactivity disorder ("ADHD"), tick bite, arthralgia[7], knee pain, palpitations, and candidiasis[8]. On April 18, 2011, Dr. Blair completed a Physical RFC Questionnaire regarding Dunn. (Tr. 461-465.) Dr. Blair indicated that Dunn had seronegative spondyloarthropathy and her prognosis was progressive degeneration. (Tr. 461.) Dr. Blair based her description of the clinical findings and objective signs on information from a rheumatologist. (Tr. 461.) Dr. Blair opined that Dunn could continuously sit and stand for 30 minutes at a time and that Dunn must walk for 20-30 minutes after sitting and must sit after standing. (Tr. 462.) Dr. Blair opined that Blair could sit, stand, and walk less than 2 hours in an 8 hour work day. (Tr. 462.). Dr. Blair also indicated that Blair must walk every 20 to 30 minutes for 4 minutes during an 8 hour work day. (Tr. 463.) She

---

[5] Chronic rhinitis is a protracted sluggish inflammation of the nasal mucous membrane. Stedman's Medical Dictionary 1566 (27th ed. 2000).
[6] Dyspnea is "shortness of breath." Stedman's Medical Dictionary 556 (27th ed. 2000).
[7] Arthralgia is "pain in a joint, especially one not inflammatory in character." Stedman's Medical Dictionary 149 (27th ed. 2000).
[8] Candidiasis is "an infection with, or disease caused by Candida … This disease usually results from debilitation, … physiologic change, prolonged administration of antibiotics, and iatrogenic and barrier breakage." Stedman's Medical Dictionary 277 (27th ed. 2000).

also stated that Dunn would need to take more than 10 unscheduled breaks to rest during an average 8 hour work day and shift positions at will. (Tr. 463.) Dr. Blair indicated that Dunn would need to use a cane and could rarely lift less than 10 pounds and never lift more than that weight. (Tr. 463.) Dr. Blair also noted that Dunn could rarely twist, stoop, bend, crouch, squat, or climb ladders or stairs. (Tr. 464.) Dr. Blair opined that Dunn had significant limitations in reaching, handling, and fingering and that she would be likely to miss more than 4 days of work per month as a result of her impairments. (Tr. 464.) Dr. Blair determined that Dunn should avoid temperature extremes and that she could not tolerate humidity. (Tr. 465.) Dr. Blair stated that June 22, 2004 was the earliest date the limitations applied. (Tr. 465.)

### 7. Dr. John D. Wilkes

Dunn received treatment for anemia and iron deficiency from February 2006 to December 2010. (Tr. 490-514.) In November 2008, Dunn reported that she had been diagnosed with seronegative spondyloarthropathy and was doing extremely well with Remicade therapy. (Tr. 492.) Dr. Wilkes determined that Dunn's follow-up could by conducted annually instead of bi-annually like past appointments. (Tr. 490-497.) By December 2010, Dunn's iron levels revealed normal saturation and she needed no further follow-up. (Tr. 490.) Dr. Wilkes also found that she no longer need oral iron supplements. (Tr. 490.) Dunn reported to Dr. Wilkes at her last visit that she had problems with fatigue, but she was able to perform most of her usual activities. (Tr. 490.)

### 8. Brain & Spine Center

Dunn received physical therapy from the Brian and Spine Center at St. Luke's Hospital weekly from September to December 2007. (Tr. 278-297.) On November 5, 2007, Russell Faves, a physical therapist, noted that Dunn had marked pain and spasms in the area of her low

thoracic spine with fluctuating spasms in her upper back and low back. (Tr. 296.) The treatment consisted of deep soft tissue techniques and myofascial stretches. (Tr. 296.)

### 9. Dr. Francisco J. Garriga

Dr. Francisco J. Garriga, a rheumatologist, began treating Dunn in January 2008 upon a referral from Dr. Blair. (Tr. 326.) Dr. Garriga diagnosed Dunn with ankylosing spondylitis[9] (Tr. 324, 432.) On May 23, 2008, Dunn indicated that she "had her life back." (Tr. 324.) Dr. Garriga noted that Dunn reported "dramatic improvement of pain [indecipherable], but morning stiffness, persists." (Tr. 324.) By September 15, 2008, Dr. Garriga noted that Dunn was doing very well with the medication Remicade and that she was virtually symptom free until 2 to 3 days before her next infusion of Remicade became due. (Tr. 323.) On March 23, 2011, Dunn reported to Dr. Garriga that she had no stiffness or pain, but she experienced some nausea with posture change and that she was sleepy and tired. (Tr. 415.) Dr. Garriga also noted that her joints were normal, she had normal range of motion in her hips, and no swollen joints, and no tender or trigger points. (Tr. 416.) He noted that he did not have a good explanation for her low energy. (Tr. 416.)

On May 13, 2011, Dr. Garriga completed a Physical RFC Questionnaire regarding Dunn. (Tr. 466-470, 472.) Dr. Garriga stated that Dunn had ankylosing spondylitis and that her prognosis was fair. (Tr. 466.) Dr. Garriga described Dunn's symptoms as morning stiffness, back pain, fatigue, and inability to concentrate. (Tr. 466.) He stated that Dunn had done well with IV infusions with no major side effects and she had occasional bad days. (Tr. 466.) Dr. Garriga opined that Dunn could walk 2 city blocks without rest or severe pain. (Tr. 467.) He

---

[9] Ankylosing spondylitis is "a form of degenerative joint disease that affects the spine. It is a systemic illness of unknown etiology, affecting young persons, predominantly, and producing pain and stiffness as a result of inflammation of the sacroiliac, intervertebral, and costovertebral joints, paraspinal calcification, with ossification, and ankylosis of the spinal joints, may cause complete rigidity of the spine and thorax." Dorland's Illustrated Medical Dictionary 1754 (37th ed. 2012).

also opined that she could stand or walk less than 2 hours and sit about 4 hours in an 8 hour work day. (Tr. 467.) Dr. Garriga indicated that Dunn would need to walk every 90 minutes for 5 minutes in an 8 hour work day. (Tr. 468.) Dr. Garriga noted that Dunn did not need a cane or other assistive device and that she could lift and carry less than 10 pounds frequently and 10 pounds occasionally. (Tr. 468.) Dr. Garriga did not find that Dunn had any significant limitations with reaching, handling, or fingering. (Tr. 469.) Dr. Garriga estimated that Dunn would miss about 4 days of work per month as a result of her impairments or treatment. (Tr. 469.) He opined that the earliest date that her limitation applies is early 2004. (Tr. 472.)

On May 21, 2011, Dr. Garriga wrote a letter for Dunn stating that Dunn was initially diagnosed with inflammatory bowel disease long before her ankylosing spondylitis diagnosis was made. (Tr. 515.) Dr. Garriga also stated that the two diseases are linked. (Tr. 515.) Dr. Garriga further noted that blood work done in May 2007 showed microcytic anemia and hyperglobulinemia, both commonly found in patients with chronic inflammatory disease and immune disease. (Tr. 515.) Dr. Garriga opined that it was very reasonable to assume that Dunn was suffering from severe autoimmune disease as recently as April 2007 and it was reasonable to assume that she suffered from fatigue, pain, and stiffness at that time. (Tr. 515.)

### 10. Dr. Kevin Threlkeld

Dr. Kevin Threlkeld completed a Physical RFC Assessment of Dunn based solely on a review of the medical records. (Tr. 363-368.) Dr. Threlkeld diagnosed Dunn with seronegative spondyloarthropathy, allergic asthma, osteonecrosis of the bilateral knees, chronic anemia, and ulcerative colitis. (Tr. 363.) Dr. Threlkeld found that Dunn could lift and carry 20 pounds occasionally and 10 pounds frequently. (Tr. 364.) He also opined that she could stand and/or walk for six hours in an eight hour work day and sit about six hours in a workday. (Tr. 364.) He

found that she could occasionally climb ramps and stairs, stoop, and crouch. (Tr. 365.) Dr. Threlkeld determined that Dunn should never climb ladders, ropes, or scaffolds, crouch, or crawl. (Tr. 365.) Dr. Threlkeld did not find that Dunn had any manipulative, visual, or communicative limitations. (Tr. 365-366.) He determined that she needed to avoid concentrated exposure to extreme cold and heat, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 366.)

V.      Discussion

Dunn asserts two errors on appeal. First, Dunn asserts that the ALJ's RFC finding was not supported by some medical evidence and conflicted with her treating physicians' opinions. Second, Dunn contends that the hypothetical question of the vocational expert did not capture the concrete consequences of her impairment; therefore, the VE's response cannot constitute substantial evidence.

    A.      Residual Functional Capacity

Dunn contends that the ALJ's RFC determination was not supported by medical evidence in the record, because the ALJ improperly discounted the opinions of her treating physicians, failed to cite medical evidence to support its findings, and improperly evaluated her activities of daily living.

The RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(a). The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own

13

descriptions of his or her limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "Although the ALJ bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence, a claimant's [RFC] is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is "required to consider at least some supporting evidence from a [medical] professional." *Lauer*, 245 F.3d at 704. An RFC determination will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). At the outset, the Court finds that the ALJ cited to medical evidence in the record to support the findings regarding Dunn's RFC. Therefore, the Court will focus on whether the ALJ erred in discounting Dunn's treating physicians' opinions and evaluating her activities of daily living.

### 1. Medical Opinion Testimony

In his opinion, the ALJ noted that Dr. Garriga and Dr. Blair completed Physical RFC questionnaires regarding Dunn's impairments. (Tr. 18.) The ALJ stated that the value of doctors' opinions were undermined, because (1) they were completed more than 3 years past the date last insured in 2007, (2) Dr. Garriga did not treat Dunn before her date last insured, and (3) Dr. Blair's treatment records during the insured period did not indicate the presence of an impairment that resulted in the severe symptoms shown in the questionnaire.[10] (Tr. 18.)

Dunn has the burden to show that she had a disabling impairment before her insured status expired on December 31, 2007. *See Barnett v. Shalala*, 996 F.2d 1221 (8th Cir. 1993) (*citing Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984)). "When an individual is no longer insured for Title II disability purposes, [the Court] will only consider [her] medical condition as of the date she was last insured." *Davidson v. Astrue,* 501 F.3d 987, 989 (8th Cir.

---

[10] The ALJ's opinion mistakenly confuses Dr. Garriga and Dr. Blair's names in the paragraph describing the limited value given to their opinions. (Tr. 18.) Based on the evidence in the record, the Court will reference the names as intended and in conformity with the medical evidence.

14

2007) "Evidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits may be rewarded." *Cox*, 471 F.3d at 907.

> A non-disabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II. Evidence of a plaintiff's condition subsequent to the expiration of insured status is relevant only if it relates to the severity of the claimant's condition before the expiration of her insured status. A claimant must nonetheless establish that her disability status existed before the expiration of her insured status.

*Eggering v. Astrue*, No. 4:10-CV-821 TIA, 2011 WL 39044103 at*7 (E.D. Mo. Sept. 6, 2011) (internal citations omitted).

Dr. Blair and Dr. Garriga's opinions are dated in April and May 2011 and both state that Dunn's earliest date of limitations occurred in 2004. (Tr. 465, 472.) Dr. Blair did not start treating Dunn until November 2006, and never treated her for back and hip pain. (Tr. 490-514.) Dr. Blair's treatment records do not support her findings of Dunn experiencing serious functional limitations from July 2004 through December 2007. Further, Dr. Garriga did not treat Dunn before her date last insured. (Tr. 326.) Dr. Garriga stated that he reviewed Dunn's blood work from April and May 2007 and she had symptoms that could be related to severe autoimmune disease. (Tr. 515.) But, even if Dunn experienced symptoms of her autoimmune disorder before the date last insured, there is no evidence in the medical records from the time period to find that she had an impairment or combination of impairments that rendered her disabled under the Social Security Act during that time period. The contemporaneous treatment records from all providers during the relevant time period do not indicate that Dunn's impairments were severe enough to prevent her from performing any work.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). Because Dr. Blair's treatment notes did not provide sufficient support for the opinion, the ALJ could discount her opinion. *See Anderson v. Astrue,* 696 F.3d 790, 793-94 (8th Cir. 2012). The ALJ could discount Dr. Garriga's opinion, because he did not treat her during the relevant time period and the conclusions in his opinion are inconsistent with the contemporaneous treatment records. *See* 20 C.F.R. § 404.1527(c)(2)-(4). Due to the foregoing, the Court finds that the ALJ did not err in his consideration of the opinions and in finding the opinions, "less persuasive."

## 2. Activities of Daily Living

Next, Dunn contends that the ALJ improperly evaluated her activities of daily living. The ALJ stated that the medical records did not note significant limitations as to her activities of daily living and that she was able to drive, do laundry, shop for groceries, cook, clean, vacuum, iron, and garden. (Tr. 19.) Dunn testified that she performed such activities, but had to frequently stop and take breaks while doing so. (Tr. 50-55, 176-181.) While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded

solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

>   (1) the claimant's daily activities;
>
>   (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
>   (3) any precipitating or aggravating factors;
>
>   (4) the dosage, effectiveness, and side effects of any medication; and
>
>   (5) the claimant's functional restrictions.

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. *Id.* Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski at 1322*. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988).

The ALJ found that although her capacity to perform the tasks was not mutually exclusive to a finding of disability, her ability to perform them undermines her allegations that

her impairments are as significantly limiting as alleged. (Tr. 19.) In this case, it was appropriate for the ALJ to consider Dunn's activities of daily living, as well as the inconsistencies between her allegations and her treatment records. *See* Goff *v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (ALJ can disbelieve subjective complaints if there are inconsistencies in the evidence as a whole and lack of corroborating evidence is just one of the factors the ALJ considers); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (ALJ could consider that claimant functioned as the primary caretaker for her home and two small children). Therefore, the Court finds that the ALJ did not err in assessing Dunn's activities of daily living.

### B. Vocational Expert Testimony

Finally, Dunn asserts that the hypothetical question proposed to the VE did not accurately reflect her physical impairment, and therefore the VE's response does not constitute substantial evidence. Dunn states that because the RFC is not supported by medical evidence, the hypothetical question to the ALJ is flawed. An ALJ's hypothetical question must fully describe a claimant's impairments. *Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995). These impairments must be based on the "substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010). If the hypothetical question is properly formulated, then the testimony of the VE constitutes substantial evidence. *Roe v. Chater*, 93 F.3d 672, 676 (8th Cir. 1996). Upon review of all of the evidence, the Court finds that the ALJ's question to the VE was properly formulated and therefore, her testimony could constitute substantial evidence.

## VI. Conclusion

Substantial evidence in the record as a whole supports the ALJ's final decision. Based on the foregoing, the ALJ's decision will be affirmed.

Accordingly,

**IT IS ORDERED** that the relief sought by Dunn in her Complaint and Plaintiff's Brief in Support of Complaint is **DENIED**. [Doc. 1, 6.]

**IT IS ORDERED** that a separate Judgment will be entered in favor of the Commissioner.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Carolyn W. Colvin for Michael J. Astrue in the court record of this case.

Dated this 27th day of March, 2014.

/s/ Jean C. Hamilton
JEAN C. HAMILTON
UNITED STATES DISTRICT JUDGE